Filed 12/19/23  Waits v. Hanna CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| PATRICIA L. WAITS, as Trustee, etc.,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MARK HANNA,<br><br>    Defendant and Appellant. | G061755<br><br>(Super. Ct. No. 30-2020-01146674)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, David L. Belz, Judge.  Affirmed.

Worth & Associates and Warren Worth for Defendant and Appellant.

Vogt, Resnick & Sherak, David A. Sherak and Jeany A. Duff for Plaintiff and Respondent.

## INTRODUCTION

As Ralph Waldo Emerson once wrote, "Money often costs too much."[1] In this case, money appears to have cost two siblings their relationship. In pursuit of what he believes to be his rightful share of their late mother's estate, the appellant in this matter may well have spent more in legal costs than he originally wished to recover from the estate, of which his sister, the respondent, is trustee.

The largest asset in the trust estate is the decedent's home in Orange, and that is the central focus of this appeal. Respondent claimed she and her brother had agreed she could buy him out of the house so her daughter and new son-in-law could keep it in the family. After respondent went to the trouble of securing funds to complete the buy out, her brother suddenly took issue with the valuation of the house for purposes of the final trust distribution. Respondent filed a petition for accounting and request for instructions in the probate court in order to approve her final accounting and distribution. The probate court did so, finding the parties had a valid agreement. We affirm that decision.

## FACTS

Patricia Waits and Mark Hanna are the adult children of Irene Hanna, who passed away in March 2019. Patricia lives in Trabuco Canyon, and Mark lives in Montana.

Irene[2] had created a living trust in April 2013 to handle her estate.[3] Patricia was designated successor trustee, with Mark her alternate. After payment of debts, expenses, and specific bequests, the trust document required the net proceeds of Irene's estate to be distributed equally between Patricia and Mark in the event of her death.

---

[1] Emerson, The Conduct of Life (1860).

[2] Hereafter, we refer to the parties by their first names, as a convenience to the reader. We do not intend this informality to reflect a lack of respect.

[3] Irene's husband and Mark and Patricia's father passed away in 2000.

By far, the largest asset in the trust was the family home located in Orange, which Irene and her husband had owned since its construction in 1961. Coincidentally, Patricia's daughter, Cheryl, got married in March 2019. Patricia spoke to Mark about having Cheryl and her new husband, Jacob, move into their mother's old home. Specifically, she wished to purchase Mark's interest in the residence using a refinance loan on her own home in Trabuco Canyon. At the time, Mark, who lives in Montana, was hoping to purchase a piece of land adjacent to his house there and thought he might use the inheritance from his mother for such a purpose. Thus, it would seem Patricia's proposed arrangement would have met both siblings' objectives.

Within about a week of her mother's death, Patricia says she got an appraisal done on the Orange residence by appraiser Randal Clem, an acquaintance of Mark's. Clem appraised the house at $605,000 as of March 2019.

On March 15, Mark sent Patricia a report from the realtor who had sold his Orange County home prior to his move to Montana, Lincoln LaMadrid. LaMadrid's report indicated the house was worth $638,200.

On March 15, 2019, Patricia, as trustee, listed the house with LaMadrid for $645,000. Mark, Patricia, and LaMadrid all met at the house to sign the listing agreement. Mark had suggested the listing price, and while LaMadrid did not expect the house to fetch that much, he was willing to see how the market might respond. If the house sold for $645,000, Patricia and Mark stood to net $590,000 in proceeds after $55,000 in expenses.

The purpose of listing the house, according to Patricia, was not actually to sell it, but rather to gauge its value so she could buy her brother out at a fair price. She claimed both Mark and LaMadrid knew this when she signed the listing agreement. She began applying for loans so she could get the money lined up for the buy out.

The house received several offers. Mark was consulted as each offer came in. Patricia counteroffered $635,000 after he deemed the first offer of $615,000 too low.

3

The counteroffer was rejected. However, the same buyer later proposed the highest offer the property received – $628,000. Mark rejected this offer as well, but he did not want to invest any money in upgrading the house or fixing it up for sale in order to get a higher price. Mark and Patricia decided, since there had already been an open house, they would keep the house on the market for another 30 days to see if any other offers trickled in. It was during this 30-day period that Patricia claims Mark told her he just wanted to let her buy him out. She testified they agreed they could set the value of the house at $595,000 and she would take out a loan to finance paying him his share.[4]

Patricia testified that because she and her husband are retired, they had difficulty obtaining approval for a refinance. But Mark needed funds immediately to initiate the purchase of the Montana property, so Patricia withdrew $80,000 from her retirement account in order to give him the necessary cash. She loaned the withdrawn money to the trust and paid it out to Mark on August 20, 2019. Mark acknowledges he received this money.

Sometime in September 2019, Mark stopped talking to Patricia. It is not clear from the record why this happened.

As Patricia sought a refinance loan, Cheryl and Jacob were ready to move into the residence and start cleaning and fixing it up. So she decided to let them move in and pay rent to the trust while she continued to work on getting the financing she needed. She sought advice from LaMadrid, who referred her to a local property manager to come up with a fair market rent of $2,000 per month. Patricia decided the trust should charge $2,100 per month in order to get the best value. Cheryl and Jacob signed a rental agreement with the trust on December 1, 2019, moved in, and paid monthly rent for December 2019, January 2020 and half of February 2020. During this time, Patricia on

---

[4]     Patricia testified $594,000 was the highest the pair would have netted under any of the offers they received. So Mark said if she was willing to beat that price, she could have the house. For this reason, they agreed on a $595,000 value.

4

behalf of the trust was paying all of the expenses on the house, including property tax. Cheryl and Jacob paid the utilities and also worked on repairing and upgrading the home. Mark acknowledges he received rent checks during this time period. He did not object to the arrangement.

In February 2020, Patricia finally obtained a loan allowing her to purchase Mark's share in the house. She notified her brother and asked the trust's attorney, Andrew Sexton, to begin the process of closing out the trust and making final distributions to the beneficiaries after payment of any remaining trust expenses. However, when Sexton sent the appropriate documentation to Mark's attorney with an itemization of the proceeds he would receive, there was a surprising response. Mark's attorney, Andrew Kienle, disputed the value of their mother's residence, and claimed Cheryl and Jacob were paying below-market rent. He said the current value of the residence was $660,000. Therefore, Kienle demanded Mark be given a larger distribution of $252,000 to account for the perceived underestimation of the property's value.

After her attorney received this communication, Patricia, as trustee, filed a petition for settlement of first account and report of administration of the trust, as well as a request for instructions from the court regarding the proper distribution to Mark. She sought a distribution based on a $594,000 value of their mother's home, as she alleged she and Mark agreed[5]; or alternatively, $605,000 pursuant to the appraisal done by Randal Clem shortly after Irene's death.

---

[5] Even though the siblings agreed on a $595,000 value, Patricia's counsel said "for whatever reason," likely just a scrivening error, her filed petition seeks distribution of Mark's one-half interest in the residence with an agreed property value of $594,000. The trial court ultimately entered judgment allowing distribution at a $594,000 value. Neither side seems bothered about this particular discrepancy; we note it merely for clarity.

The trial court bifurcated the trial so that it could make findings concerning the existence of an oral agreement for Patricia to buy out Mark's share. It concluded there was. Mark now appeals.[6]

## DISCUSSION

Patricia's petition was filed under Probate Code section 17200[7], which permits the trustee to petition the court regarding internal affairs of the trust, including "[s]ettling the accounts and passing upon the acts of the trustee, including the exercise of discretionary powers." (§ 17200, subd. (b)(5).)

As it succinctly summarized in the statement of decision, the issue before the trial court was "framed around Patricia's authority to distribute Mark's share from the trust estate based on the alleged agreement. If there was no agreement, then the final trust distribution must be adjusted and provision made for the improvements in the property. If there was an agreement, then Patricia had the authority to make the distribution based on that agreement." It first determined the agreement did not violate the statute of frauds (see Civ. Code § 1624), because the trust was the controlling document authorizing the trustee to distribute the estate's assets. And even if the statute of frauds did apply, the trial court concluded Mark was equitably estopped from asserting it because he never objected "to the net value of $594,000" and because he was unjustly enriched by his failure to object. The court next determined Patricia had not engaged in self-dealing by negotiating with Mark, since the purchase involved a family residence and was never actually consummated. Finally, the court concluded Patricia had a good faith belief Mark had agreed to let her purchase the home at a net value of $594,000 and that her efforts to determine a proper value were "fair and reasonable using a reasonable person standard." It further found she took steps in reliance on this agreement while

---

[6] The trial court also heard evidence regarding a disputed trust asset, a stamp collection originally belonging to Patricia and Mark's father. This portion of the trial court's decision is not being appealed.

[7] All statutory references are to the Probate Code unless otherwise indicated.

6

Mark failed to object. It instructed Patricia to complete the final trust distribution based on the net value of $594,000 for the home.

Mark contends the trial court erred in three respects.

First, he argues it applied the wrong legal standard of care when it found Patricia's efforts to determine the value were fair and reasonable under a reasonable person standard.

Second, he argues the court failed to adhere to its established bifurcation plan. Instead of saving evidence regarding valuation to phase two of the trial, the court entered judgment after phase one, thereby, in Mark's view, cutting off his due process right to have all of his valuation evidence properly considered.

Finally, he argues the trial court improperly applied the doctrine of equitable estoppel by finding he should have objected to Patricia's actions in reliance on their alleged agreement. Mark feels he was under no obligation to object and that his silence could not legally have been construed as consent to what he views as a self-dealing transaction by a trustee.

The first and third arguments involve issues of law which we independently decide. The second argument we review for abuse of discretion. We disagree with Mark on all three arguments.

## I.        Standard of Care

Mark argues the trial court did not apply the standard of care when it stated as follows: "The court finds that Patricia had a good faith belief that Mark, on July 16, 2019, agreed to allow Patricia to purchase the residence from the trust for a net value of $594,000. The court finds Patricia's efforts to determine the correct net value for the residence was fair and reasonable using a reasonable person standard." Mark claims the court should have used the standard in section 16040, subdivision (a): "The trustee shall administer the trust with reasonable care, skill, and caution under the circumstances then prevailing that a prudent person acting in a like capacity would use in the conduct of an

7

enterprise of like character and with like aims to accomplish the purposes of the trust as determined from the trust instrument."

Section 16040, subdivision (a) "provides a general standard of care for administration of the trust[.]"  (See Cal. Law Revision Com. com., ___ West's Ann. Prob. Code (1990 ed.) foll. § 16040, p. 1905.)  It was derived from subdivision (a)(1) of former Civil Code section 2261, which was repealed in 1986.  (*Id.* at p. 1905.)  Former Civil Code section 2261 "applied to investment and management decisions[,]" superseding the previously applicable "'ordinary care and diligence'" standard.  (*Ibid.*)

According to the Restatement (Third) of Trusts, section 77, the prudent person standard "requires the exercise of reasonable, care, skill, and caution[,]" and "[i]f the trustee possesses, or procured appointment by purporting to possess, special facilities or greater skill than that of a person of ordinary prudence, the trustee has a duty to use such facilities or skill."  (See also § 16014, subd. (a) ["The trustee has a duty to apply the full extent of the trustee's skills."].)

Mark has not persuaded us the trial court ran afoul of this standard.  Irene's trust contained the following provision: "After the death of the trustor, upon any division or partial or final distribution of the trust estate, the trustee(s) shall have the power to partition, allot and distribute the trust estate in undivided interests or in kind, or partly in money and partly in kind, *at valuations determined by the trustee(s)*, and to sell such property as the trustee(s) consider necessary to make such division or distribution." (Italics added.)  The evidence showed Patricia made these valuations according to the prudent person standard.

She first sought an appraisal from Mark's acquaintance, Clem, and he appraised the home at $605,000.  She then reviewed the report of LaMadrid, Mark's own former Orange County realtor, which showed the home was worth nearly $640,000.  She listed the home with LaMadrid in March 2019, using Mark's suggested price of $645,000, which would have netted the siblings $590,000.  She consulted with Mark on

each offer which came in and followed his wishes as to how to respond. The highest offer they received of $628,000 was on July 28, 2019, and would have netted them $594,115.20 after closing costs.[8] It was during this timeframe that the siblings allegedly discussed Patricia buying Mark's share at half of $595,000. Mark does not articulate what else Patricia could have done to determine the fair market value of the home at the time they desired to liquidate his interest in it.

Mark suggests Patricia might have been able to do more to accurately estimate the value of the home because of her educational background and licensure as a certified public accountant (CPA). Patricia testified that she sat and passed the Illinois CPA exam in 1994, but she has never practiced professionally in any jurisdiction. But even if she had, we cannot think of anything a CPA would have done differently to accurately estimate the value of the property. Real estate appraisal is not usually in an accountant's wheelhouse.

Mark also argues that Patricia violated the standard of care by valuing the property at the time of their mother's death rather than at the time of distribution. He cites section 21118, subdivision (a), which states: "If an instrument authorizes a fiduciary to satisfy a pecuniary gift wholly or partly by distribution of property other than money, property selected for that purpose shall be valued at its fair market value on the date of distribution, unless the instrument expressly provides otherwise."

We disagree. When Mark's attorney told Patricia in February 2020 that the property was worth $660,000, Patricia tried to ask for information to substantiate this number. She received no response from the attorney or from Mark, who by that point was refusing to talk to her. She then turned to a realtor who lived in Irene's neighborhood, a Mr. Hamilton. He told her he would have listed it for $650,000, only $5,000 more than the list price Mark had suggested a year earlier. Hamilton doubted the

---

[8]     We emphasize that Mark rejected this offer.

property would fetch that high a price because it needed substantial repairs. And Mark had already indicated he did not want to invest any money to fix it up. Thus, the evidence indicates that $594,000 or thereabouts was still a fair market value for the property (approximately $650,000 minus closing costs) in February 2020 when Patricia attempted to make the final distribution from the trust. Mark put on no evidence that it was not, and indeed, he testified he got the $660,000 number from monitoring Zillow. Hardly an exact valuation method, to be sure.

The trustee's standard of care "is to be judged on the basis of circumstances at the time of that conduct, not with the benefit of hindsight or by taking account of developments that occur after the time of the action or decision." (Rest.3d Trusts, § 77, com. a, p. 82.) The pandemic housing boom may have caused real estate values to skyrocket since 2020. But the "date of distribution" for our purposes was the date Patricia actually tried to distribute the monies – February 2020. There was no violation of section 21118's requirements.

II.        **Evidence of Valuation**

Mark might respond that he would have put on evidence of the house's proper valuation had the trial court not entered judgment when it did, preventing some of his valuation experts from testifying. He designated two experts on this subject – John Valdez and Brian Lambert. Lambert was going to testify as to three appraisals he did for the property as an expert – one at the date of Irene's death, one in the middle of the siblings' efforts to sell or divide the property, and one as of the start of trial. Valdez was going to opine regarding the fair rental value of the property. They ultimately never testified. To understand why, we must recount some history.

When Patricia filed her petition, Mark filed objections and an answer. He said the alleged agreement (which he called "imaginary") was void and unenforceable, in part because it was not in writing and because the agreement was not fair and reasonable to him. (See §§ 16463, subd. (e); 16464, subd. (b); & 16465, subd. (b).) In addition to

10

denial of Patricia's accounting, Mark sought damages against her for violations of her fiduciary duty.

When the parties filed their trial briefs, Patricia objected that Mark was improperly seeking affirmative relief in his answer.

Patricia brought a motion in limine to exclude testimony from Mark's expert regarding the trustee's standard of care. She contended since Mark had not filed a petition for breach of fiduciary duty, the expert's testimony was not relevant. The trial court agreed that Mark could only seek affirmative relief by way of his own petition. However, it denied Patricia's motion with the understanding that the expert could testify only about Patricia's standard of care when doing the accounting, as opposed to the standard for a breach of fiduciary duty claim.

The following day, Mark's attorney, Warren Worth, filed a declaration seeking to amend Mark's response to include affirmative relief for breach of fiduciary duty. The court again told Worth he could not seek affirmative relief by amending his answer. However, the court suggested there were some issues regarding the claims Worth desired to allege and the accounting that overlapped. Mark's claims were, to some degree, objections against the accounting, and if the court agreed, it would not approve the accounting. However, it did not think it could consider exemplary damages or surcharge damages.

The court then suggested that trial be focused on the two main issues: the house agreement and the stamps. From these rulings, the parties could then decide how to proceed. Worth agreed but expressed his desire to "have the opportunity to bring in [his] expert witnesses . . . regarding valuation of the house[.]" The court responded that these experts would not be needed in the initial phase of the case because the court "could bifurcate on the damages." Worth pointed out that he should be able to present evidence that the agreement was unfair to Mark. The court agreed that he should be able to present evidence of unfairness, but evidence regarding the then-current appraisal of the house

11

would be irrelevant. The relevant timeframe for the court's purposes was the time when the siblings were allegedly agreeing for Patricia to buy Mark out. As the trial court explained, "if there was no agreement, then we can move on to the other issues. If there was an agreement, then obviously that makes some of those issues moot." Based on this discussion, the trial proceeded on the two issues the court articulated.

When Mark's attorney, Warren Worth, asked for time during the trial to present Valdez and Lambert's testimony, he was met with an objection from Patricia's attorney, David Sherak: "Your Honor, I think that a lot of those issues go to the damages." The court agreed, saying the only issue at the moment was "whether or not there was an agreement to sell."

"'A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10).)" (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 446-447.)

We find no such abuse here. The trial court's approach was reasonably calculated to resolve the main issues between the parties and create efficiencies in the trial. It correctly identified the existence of an agreement to buy out Mark's interest as a central question. And bound up in that question was whether Mark and Patricia agreed she could buy out his interest at a $595,000 valuation. Thus, the court had to resolve whether (1) the siblings agreed Patricia should buy out Mark's share, and (2) $595,000 was the price. The accuracy of $595,000 as a valuation was, if anything, relevant to whether the agreement was fair and reasonable to Mark. But from the evidence before the court, there was no reason to believe the agreement was *not* fair and reasonable.

Patricia used Mark's own contacts to get the property appraised at $605,000 and then later list the property for sale at $645,000 in the spring of 2019. There is no

12

evidence she prevented Mark from seeking out independent advice and counsel on the appropriate valuation of the property at any time.

Mark's expert, Lambert, would have testified that he appraised the property for $652,500 in March 2019. But this was not far off from the list price Patricia actually used, and more importantly, the property never received an offer anywhere near that.[9] Lambert's opinion as to the property's present day value is completely irrelevant, as Patricia attempted to distribute the proceeds in February 2020, not at the time of trial.

Mark does not give any details on Valdez's proffered opinion as to rents, but Patricia's efforts to determine a fair market rent were completely within bounds as well. She sought advice from a local property manager and charged even more than he suggested she charge. The evidence does not show the agreement was unfair. To the contrary, the evidence shows Patricia went out of her way to be fair and reasonable to the trust, which is exactly her duty as a trustee. We do not think the trial court erred by entering judgment on the basis of the evidence before it.

**III.          Estoppel and the Statute of Frauds**

Finally, Mark raises concerns regarding the court's conclusions about the applicability of the statute of frauds to this transaction. The court held the agreement did not fall under the statute of frauds because the transaction was a distribution of assets by a trustee, as to which the controlling writing is the trust document. Even if the statute of frauds did apply, the court found Mark would be estopped from asserting it because he never objected to what Patricia did and was enriched. Mark says the court has "approved an illegal self-dealing transaction" by considering his silence in the face of Patricia's actions as consent to the agreement.

---

[9]          Any appraisals of the property in or around March 2019 or while the property was for sale are not nearly as persuasive as the offers the property received during that time frame. The property's actual value is the price potential buyers are willing to pay.

13

In the first instance, we agree with the trial court that the trust document is controlling. Mark claimed the agreement to buy out his interest violated subdivision (a)(3) of the statute of frauds, Civil Code section 1624. This provision requires a writing for "[a]n agreement for . . . the sale of real property, or of an interest therein[.]" (Civ. Code, § 1624, subd. (a)(3).) Irene's residence was in her trust; it did not belong to either Patricia or Mark. Her trust document determines how the property is to be divided, and Patricia, as trustee, was given the power to sell, convey, divide, or transfer title to trust property.

What's more, an oral agreement to sell an interest in property can be taken out of the statute of frauds by part performance. (See *Engasser v. Jones* (1948) 88 Cal.App.2d 171, 176.) Here, Patricia borrowed from her retirement account to pay Mark $80,000 as an initial distribution from the trust estate. Cheryl and Jacob then moved into the home and began paying rent, which Mark received and pocketed.[10] Patricia also pursued financing until she was finally able to pay Mark the remainder of what she owed. It would have been unjust to permit Mark to repudiate the agreement at that point.

Mark seems to believe he need not have objected to Patricia's actions because he had no duty to communicate with her. We wholeheartedly disagree. In this case, Mark decided at a certain point he no longer wished to speak to his sister. Why, we don't know. But we do know that Patricia continued to keep her brother informed about the status of the house, and Mark continued to accept distributions and rental income from the trust. How was Patricia to know Mark had any concerns if he refused to communicate them to her?

We agree that Mark was estopped from denying the existence of the agreement.

---

[10] We note that an offeree's acceptance of services or of consideration tendered with an offer is itself an acceptance of the offer. (Civ. Code, §1584.)

14

## DISPOSITION

The judgment is affirmed.  Respondent to recover her costs on appeal.


BEDSWORTH, ACTING P. J.

WE CONCUR:


SANCHEZ, J.


GOODING, J.

15